McGEE, Chief Judge, dissenting.
I. First Amendment [1]
I believe N.C. Gen. Stat. § 14-225.2(a)(2) (2017) (" N.C.G.S. § 14-225.2(a)(2)" or "the statute") is unconstitutional on its face and as applied to Defendant. The relevant language of the statute states: "A person is guilty of harassment of a juror if he: .... As a result of the prior official action of another as a juror in a grand jury proceeding or trial, threatens in any manner or in any place, or intimidates the former juror or his spouse." N.C.G.S. § 14-225.2(a)(2). For simplicity, I will refer to "former jurors" as referenced in N.C.G.S. § 14-225.2(a)(2) as "jurors."
As the majority opinion recognizes, when considering a First Amendment challenge, "[w]e must first determine whether [the challenged statute] restricts protected speech or expressive conduct, or whether the statute affects only nonexpressive conduct. Answering this question determines whether the First Amendment is implicated." State v. Bishop , 368 N.C. 869, 872, 787 S.E.2d 814, 817 (2016).[2]
A. Is the First Amendment Implicated
I first note that, though the State may have argued this "threshold" issue at trial, on appeal the State seems to concede that the statute does implicate the First Amendment, as it does not argue this issue in its brief-its arguments are limited to contentions that the statute survives First Amendment analysis pursuant to either intermediate scrutiny or strict scrutiny. I disagree with the majority opinion's holding that "[w]hen read in context, it is apparent [the statute's language] applies to a defendant's conduct -threats and intimidation-directed at a particular class of persons-jurors-irrespective of the content [,]" and "not speech."
*679 (Emphasis added). It is, in part, precisely because the statute proscribes conduct "irrespective of the content" of that conduct that it implicates the First Amendment. " 'A law directed at the communicative nature of conduct must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires.' " Texas v. Johnson , 491 U.S. 397, 406, 109 S.Ct. 2533, 2541, 105 L.Ed.2d 342, 355 (1989) (citation omitted). "The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message *532 may be offensive to his audience." Hill v. Colorado , 530 U.S. 703, 716, 120 S.Ct. 2480, 2489, 147 L.Ed.2d 597, 611 (2000).
The fact that the express language of the relevant part of N.C.G.S. § 14-225.2(a)(2) proscribes "threatening" or "intimidating" a juror is not sufficient to support a holding that the statute does not implicate the First Amendment. The United States Supreme Court in Cohen v. California , for example, held a California statute that "prohibit[ed] 'maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person ... by ... offensive conduct' " violated the defendant's First Amendment rights. Cohen v. California , 403 U.S. 15, 16, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284, 288 (1971) (citation omitted). The express language of the statute in Cohen prohibited "offensive conduct." The express language of N.C.G.S. § 14-225.2(a)(2) prohibits "threats" or "intimidation." All three of these terms, on their face, can be defined as "conduct." However, the Court in Cohen held-despite the fact that the express language of the California statute was limited to "conduct"-that statute in reality restricted protected speech, because of the type of conduct that could be subject to prosecution pursuant to its terms. The defendant in Cohen was convicted of "disturbing the peace" through "offensive conduct" for wearing a jacket adorned with the words "F_ck the Draft." Id. at 16, 91 S.Ct. at 1784, 29 L.Ed.2d at 288-89 (citation omitted). The Court recognized that, according to longstanding precedent, certain kinds of speech are not protected by the First Amendment because of the inherent dangers involved when those kinds of speech are used. Id. at 19-20, 91 S.Ct. at 1785, 29 L.Ed.2d at 290-91 ("[T]his case cannot be said to fall within those relatively few categories of instances where prior decisions have established the power of government to deal more comprehensively with certain forms of individual expression simply upon a showing that such a form was employed. This is not, for example, an obscenity case." The Court also held that the defendant's conduct did not fall within the "fighting words" exception to First Amendment protections.).
The Court in Cohen held: "[The defendant's] conviction ... rests squarely upon his exercise of the 'freedom of speech' protected from *680 arbitrary governmental interference by the Constitution and can be justified, if at all, only as a valid regulation of the manner in which he exercised that freedom[.]" Id. at 19, 91 S.Ct. at 1785, 29 L.Ed.2d at 290. Because the defendant's alleged offensive conduct in Cohen was an act of protected speech, it did not matter that some other type of conduct might constitute "offensive conduct" that could be prosecuted without violating the First Amendment. Id. at 26, 91 S.Ct. at 1789, 29 L.Ed.2d at 294-95 ("[A]bsent a more particularized and compelling reason for its actions, the State may not, consistently with the First and Fourteenth Amendments, make the simple public display here involved of this single four-letter expletive a criminal offense. Because that is the only arguably sustainable rationale for the conviction here at issue , the judgment below must be reversed.").
In the present case, although the statute proscribes the following relevant "conduct:" "threaten[ing] in any manner or in any place, or intimidat[ing] [a] former juror" "[a]s a result of the prior official action of [the former] juror[,]" N.C.G.S. § 14-225.2(a)(2), the only "sustainable rationale for the conviction" was Defendant's "speech"-his verbal communication of his opinion to the jurors that their verdict constituted an injustice to his brother. The verdict of a jury convicting a defendant is unquestionably as much an act of the State as the indictment of that defendant, and a citizen's right to publicly criticize a jury's verdict is protected by the First Amendment.
Therefore, the conduct proscribed by N.C.G.S. § 14-225.2(a)(2) implicates protected speech unless it is covered by some previously recognized exception to First Amendment protections. Virginia v. Black , 538 U.S. 343, 358, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535, 551 (2003) ("The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. See, e.g., *533 Chaplinsky v. New Hampshire , 315 U.S. 568, 571-572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ('There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem')."). The previously recognized exception most relevant to our analysis of N.C.G.S. § 14-225.2(a)(2) is the "true threat" exception. See Id. at 359, 123 S.Ct. at 1547, 155 L.Ed.2d at 552 (citations omitted) ("the First Amendment also permits a State to ban a 'true threat' ").
The Fifth Circuit recently held a statute that does not explicitly limit the term "threat" to "true threats" cannot be construed in a manner that does not implicate the First Amendment:
[Section 14:122 of the] statute criminalizes "public intimidation," defined as "the use of violence, force, or threats *681 upon [a specified list of persons, including any public officer or public employee] with the intent to influence his conduct in relation to his position, employment, or duty." (Emphasis added.) On its face, the statute is extremely broad. The definition of "threat" generally encompasses any "statement of an intention to inflict pain, injury, damage, or other hostile action on someone in retribution for something done or not done." That definition easily covers threats to call your lawyer if the police unlawfully search your house or to complain to a DMV manager if your paperwork is processed wrongly.
....
According to the state, we should construe the statute to apply only to true threats, i.e. "a serious expression of an intent to commit an act of unlawful violence" toward specific persons. There are several reasons why we cannot do so. First, the definition of "threat" is broader than true threats: any "statement of an intention to inflict pain, injury, damage , or other hostile action on someone in retribution for something done or not done." [ (citing "Oxford Dictionaries (Online ed.)") (emphasis added by Fifth Circuit).] ....
Finally, Louisiana's reliance on its caselaw proves to be a double-edged sword. As plaintiffs note, the Louisiana Court of Appeals has upheld the conviction of a defendant who violated Section 14:122 by threatening "to sue" an officer and "get [his] job" if the officer arrested him. Plainly, such a threat suggests no violence-indeed, the threat appears to be a plan to take perfectly lawful actions. Accordingly, we cannot construe Section 14:122 to apply only to true threats of violence.
It follows that, properly understood, Section 14:122 applies to any threat meant to influence a public official or employee, in the course of his duties, to obtain something the speaker is not entitled to as a matter of right. But so construed, the statute reaches both true threats-such as "don't arrest me or I'll hit you"-and threats to take wholly lawful actions-such as "don't arrest me or I'll sue you." In both those examples, the speaker may be legally subject to arrest and is trying to influence a police officer in *682 the course of his duties. Thus, Section 14:122 makes both threats a criminal act.
Seals v. McBee , 898 F.3d 587, 593-95 (5th Cir. 2018) (citations and footnotes omitted).
Our Supreme Court in Bishop implicitly recognized the necessity, as held in Seals , that any definition of "intimidate" in the criminal stature before it would have to rise to the level of a "true threat" in order to survive First Amendment analysis. The Court rejected the State's argument that, in order to render the statute involved constitutional, the Court itself should "define 'to intimidate' as 'to make timid; fill with fear[,]' " because "intimidate" had not been defined by statute or case law for that specific statute . The Court reasoned:
While we need not, and do not, address a hypothetical statute limited to proscribing unprotected "true threats"-which the United States Supreme Court has defined as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"-we do note that such a statute might present a closer constitutional question . Cf. Elonis v. United States , ("reversing the defendant's conviction under a federal statute that made 'it a crime to transmit in interstate commerce *534 "any communication containing any threat ... to injure the person of another" ' and for that reason, seeing no need to consider related First Amendment concerns").
Bishop , 368 N.C. at 878 n.3, 787 S.E.2d at 821 n.3 (citations omitted) (emphasis added). N.C.G.S. § 14-225.2(a)(2) suffers from this same constitutional deficiency.
N.C.G.S. § 14-225.2(a)(2) fails to define its key terms. Neither "threaten" nor "intimidate" is defined and, absent any clear definition of these terms by the General Assembly, or our appellate courts, we cannot construe the statute in a manner that prohibits only "true threats." The trial court's refusal, in the present case, to include in its jury instruction a definition of "intimidate" as limited to a "true threat," consistent with Bishop and Black , demonstrates this deficiency in the statute. In Bishop , concerning the relevant statute in that case, the Court stated why clear definitions are a requirement:
Regarding motive, the statute prohibits anyone from posting forbidden content with the intent to "intimidate *683 or torment" a minor. However, neither "intimidate" nor "torment" is defined in the statute , and the State itself contends that we should define "torment" broadly to reference conduct intended "to annoy, pester, or harass." The protection of minors' mental well-being may be a compelling governmental interest, but it is hardly clear that teenagers require protection via the criminal law from online annoyance.
Bishop , 368 N.C. at 878-79, 787 S.E.2d at 821 (emphasis added). The Court further underscored the necessity, for First Amendment purposes, of limiting terms such as "intimidate" to acts constituting "true threats." Id. at 878 n.3, 787 S.E.2d at 821 n.3. (had "intimidate" been defined in the relevant statute as limited to "true threats," "such a statute might [have] present[ed] a closer constitutional question").
Because the majority opinion holds that the statute only proscribes non-expressive conduct, it does not see any need to define "threaten" or "intimidate" in a manner that restricts those terms to actions that constitute "true threats." Because the State implicitly concedes that the statute implicates First Amendment protections, it-unlike in Bishop -does not even suggest any appropriate definitions for those terms.[3] Undefined, "threaten" and "intimidate" encompass a multitude of activities that do not constitute "true threats;" those that "communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black , 538 U.S. at 359, 123 S.Ct. at 1548, 155 L.Ed.2d at 552 ; Bishop , 368 N.C. at 878 n.3, 787 S.E.2d at 821 n.3. Instead, the majority opinion's holding will allow prosecution for protesting government action based on jurors' claims that a defendant's actions made them *684 feel "timid or fearful." State v. Hines , 122 N.C. App. 545, 552, 471 S.E.2d 109, 114 (1996) (citation omitted). As the United States Supreme Court has declared:
[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It *535 may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest . There is no room under our Constitution for a more restrictive view .
Terminiello v. City of Chicago , 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131, 1134-35 (1949) (citations omitted). In order to be properly excluded from First Amendment protections, the definitions of "threaten" and "intimidate" must not fall below the "true threat" standard set forth by the United States Supreme Court:
[T]he First Amendment ... permits a State to ban a "true threat." Watts v. United States , 394 U.S. 705, 708 [89 S.Ct. 1399, 22 L.Ed.2d 664] (1969) ; accord, R.A.V. v. City of St. Paul , [505 U.S. 377,] 388 [112 S.Ct. 2538, 120 L.Ed.2d 305], ("[T]hreats of violence are outside the First Amendment"); Madsen v. Women's Health Center, Inc. , 512 U.S. 753, 774 [114 S.Ct. 2516, 129 L.Ed.2d 593] (1994) ; Schenck v. Pro-Choice Network of Western N.Y. , 519 U.S. 357, 373 [117 S.Ct. 855, 137 L.Ed.2d 1] (1997).
"True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. See Watts v. United States, supra , at 708 [89 S.Ct. 1399] ("political hyperbole" is not a true threat); R.A.V. v. City of St. Paul , 505 U.S. at 388 [112 S.Ct. 2538]..... [A] prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is *685 a type of true threat , where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death .
Black , 538 U.S. at 359-60, 123 S.Ct. at 1547-48, 155 L.Ed.2d at 552 (citations omitted) (emphasis added); see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists , 290 F.3d 1058, 1062 (9th Cir. 2002) (properly construing the relevant federal statute in the defendants' appeal "requires that we define 'threat of force' in a way that comports with the First Amendment [i.e. as a 'true threat'], and it raises the question whether the conduct that occurred here falls within the category of unprotected speech"). Precedent from the United States Supreme Court, cited with favor by our Supreme Court, makes clear that full First Amendment protections apply to statutes like N.C.G.S. § 14-225.2(a)(2) unless the relevant terms, such as "threaten" or "intimidate," have been defined as limited to "true threats." Black , 538 U.S. at 359-60, 123 S.Ct. at 1547-48, 155 L.Ed.2d at 552 ; Bishop , 368 N.C. at 878-79, 787 S.E.2d at 820-21. Because the majority opinion does not require that the N.C.G.S. § 14-225.2(a)(2) terms "threaten" and "intimidate" be limited to "true threats" as defined by our Supreme Court and the United States Supreme Court, I would hold that the First Amendment is implicated.
B. First Amendment Analysis
1. Content Based or Content Neutral
Having concluded that the First Amendment is implicated, I conduct further First Amendment review. "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals." Turner Broad. Sys., Inc. v. F.C.C. , 512 U.S. 622, 641, 114 S.Ct. 2445, 2458, 129 L.Ed.2d 497, 516-17 (1994) (citations omitted). As noted by our Supreme Court, the correct level of scrutiny depends on the nature of the speech proscribed:
Having concluded that [the statute at issue] limits speech, we now consider a second threshold inquiry: whether this portion of the [relevant] statute is content based or content neutral. This central inquiry determines the level of scrutiny we apply here.
*536 Content based speech regulations must satisfy strict scrutiny. Such restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." In contrast, content neutral measures-such as those governing only the time, *686 manner, or place of First Amendment-protected expression-are subjected to a less demanding but still rigorous form of intermediate scrutiny. The government must prove that they are "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."
Bishop , 368 N.C. at 874-75, 787 S.E.2d at 818 (citations omitted). I would hold the statute is content based and, therefore, apply strict scrutiny. In the alternative, I would also hold the statute, as written and interpreted, fails intermediate scrutiny.
"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." Reed v. Town of Gilbert, Ariz. , --- U.S. ----, 135 S.Ct. 2218, 2228, 192 L.Ed.2d 236, 245 (2015) ; see also Bishop , 368 N.C. at 875-76, 787 S.E.2d at 819 ("strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based").
N.C.G.S. § 14-225.2(a)(2) states: "A person is guilty of harassment of a juror if he: .... As a result of the prior official action of another as a juror in a grand jury proceeding or trial, threatens in any manner or in any place, or intimidates the former juror or his spouse." N.C.G.S. § 14-225.2(a)(2) (emphasis added). On its face, the statute criminalizes communication of any perceived threat to, or any form of intimidation of, a juror, by any person, based upon that person's reaction to a verdict, an indictment, or any other official action taken by the juror. In simpler terms, as long as some theory of threat or intimidation is alleged, the statute prohibits persons from expressing their discontent in response to government action -specifically the actions jurors perform for the State as required by N.C. Const. art. I, §§ 24 - 26 and our General Statutes. The fact that the State action in a trial is accomplished in part through our jury system does not diminish the governmental nature of that action.
In Bishop , our Supreme Court held:
Here, it is clear that the cyberbullying statute is content based, on its face and by its plain text, because the statute "defin[es] regulated speech by [its] particular subject matter." The provision under which defendant was arrested and prosecuted prohibits "post[ing] or encourag[ing] others to post ... private, personal, or sexual information pertaining to a minor." The statute criminalizes some messages but not others, and makes it impossible to determine *687 whether the accused has committed a crime without examining the content of his communication.
Bishop , 368 N.C. at 876, 787 S.E.2d at 819. In the present case, N.C.G.S. § 14-225.2(a)(2) criminalizes some messages-dissatisfaction with the official acts of a juror-but not others-dissatisfaction with a juror's comments concerning the verdict, for example. Therefore, it is "impossible to determine whether the accused has [violated the statute] without examining the content of his communication." Id. In the present case, the State had to examine the content of Defendant's communications to the jurors in order to determine that those communications were in response to an official act-voting to convict Defendant's brother-and, also, in order to conclude that the communications constituted "threats" or "intimidation." Had the State determined, based upon what Defendant allegedly said to the jurors, that Defendant's actions were solely in response to some non-official act-e.g. a disparaging comment made by a juror concerning Defendant or his brother, no violation of the statute would have occurred. Likewise, had the State determined that, pursuant to the majority opinion's interpretation of the statute, Defendant's comments to the jurors could not have caused the jurors to feel "frightened" or "timid," it could not have charged Defendant. I would hold that strict scrutiny should apply. Id.
*537 2. The Statute Fails Both Strict Scrutiny and Intermediate Scrutiny
However, I would also hold that the statute, as written and interpreted, fails even intermediate scrutiny and, therefore, violates the First Amendment. "Articulations of intermediate scrutiny vary depending on context, but tend to require an important or substantial government interest, a direct relationship between the regulation and the interest, and regulation no more restrictive than necessary to achieve that interest." Hest Techs., Inc. v. State ex rel. Perdue , 366 N.C. 289, 298, 749 S.E.2d 429, 436 (2012) (citation omitted). In order to survive intermediate scrutiny review, "[t]he government must prove that [the restrictions on speech] are 'narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " Bishop , 368 N.C. at 874-75, 787 S.E.2d at 818 (citation omitted). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy. A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." Frisby v. Schultz , 487 U.S. 474, 485, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420, 432 (1988) (citation omitted). I believe the statute fails to satisfy the requirements that must be met to pass intermediate scrutiny.
*688 I recognize the important governmental interest in preventing juror harassment, but I also recognize the countervailing fundamental right to challenge governmental action in a nonviolent manner. "[T]he assertion of a valid governmental interest 'cannot, in every context, be insulated from all constitutional protections.' " Packingham v. North Carolina , 582 U.S. ----, ----, 137 S.Ct. 1730, 1736, 198 L.Ed.2d 273, 281 (2017). As I discuss below with regard to Defendant's overbreadth analysis, the statute is extremely broad in scope-not "narrowly tailored." "A person is guilty of harassment of a juror if he: .... As a result of the prior official action of another as a juror in a grand jury proceeding or trial, threatens in any manner or in any place, or intimidates the former juror or his spouse." N.C.G.S. § 14-225.2(a)(2) (emphasis added). The statute is without any real limitation beyond its limitation on the type of speech that is proscribed . For example, the statute does not include any express limitations with respect to: time; place; persons who may commit the offence; what kind of "official action" is sufficient to trigger the statute; the method of making or communicating a threat; the intent to actually threaten, or how "threat" is defined or proven; the intent to actually intimidate, or how "intimidation" is defined or proven;[4] or the reasonableness of a juror's reaction to the alleged threat or intimidation. Nor does it clarify whether a juror's subjective feelings are relevant to the analysis.[5] I believe N.C.G.S. § 14-225.2(a)(2) is "more restrictive than necessary to achieve [the legitimate government] interest" involved. Hest Techs. , 366 N.C. at 298, 749 S.E.2d at 436 (citation omitted); see also McCullen , 573 U.S. at ----, 134 S.Ct. at 2535, 189 L.Ed.2d at 520 (citation omitted) (the statute cannot " 'regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals' ").
Further, it cannot be said with confidence that the statute " 'leave[s] open ample alternative channels for communication of the information[,]' " Bishop , 368 N.C. at 874-75, 787 S.E.2d at 818, because the statute, as interpreted in the majority opinion, makes almost any expression of dissatisfaction to a juror, based upon the juror's prior official actions, subject to prosecution. It is unclear how anyone who wanted to express dissatisfaction in response to a verdict-or other *538 official action *689 rendered by a juror-could determine what methods of communication might be interpreted as "threatening" or "intimidating" under the statute. The statute could well have a significant chilling effect on such expression. For example, there is nothing in the statute as interpreted in the majority opinion that would prevent prosecution of a group of people who had gathered in a public space outside a courthouse to voice their dissatisfaction with a verdict in a high profile case. The mere public gathering of people angry with a verdict could be deemed "threatening" or "intimidating," no matter what anyone in the crowd verbally or physically communicated in the presence of the departing jurors. Based upon the majority opinion's holding, it is certain that a demonstrator shouting to departing jurors that the jurors had convicted an innocent person and should feel bad for having done so, could be prosecuted in North Carolina. See Black , 538 U.S. at 365, 123 S.Ct. at 1151, 155 L.Ed.2d at 555-56 (citations and quotation marks omitted) ("It is apparent that the provision as so interpreted would create an unacceptable risk of the suppression of ideas. .... As interpreted ..., the provision chills constitutionally protected political speech because of the possibility that the Commonwealth will prosecute-and potentially convict-somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect."). Further, the State may not rely on prosecutorial discretion in order to save an otherwise unconstitutional statute:
Not to worry, the Government says: The Executive Branch construes § 48 to reach only "extreme" cruelty, and it "neither has brought nor will bring a prosecution for anything less." The Government hits this theme hard, invoking its prosecutorial discretion several times. But the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige . We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.
United States v. Stevens , 559 U.S. 460, 480, 130 S.Ct. 1577, 1591, 176 L.Ed.2d 435, 451 (2010) (citations omitted). I do not believe the statute survives intermediate scrutiny. A "true threat" requirement could likely save the statute in this regard, but the majority opinion holds there is no such requirement.
However, because I believe strict scrutiny is actually the appropriate standard for this case, I would hold that the restrictions on speech in the statute "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Bishop , 368 N.C. at 874, 787 S.E.2d at 818 (citations omitted). "The State must show not only that a challenged content based *690 measure addresses the identified harm, but that the enactment provides 'the least restrictive means' of doing so. Given this 'exacting scrutiny,' it is perhaps unsurprising that few content based restrictions have survived this inquiry." Bishop , 368 N.C. at 877-78, 787 S.E.2d at 820 (citations omitted). Obviously I do not believe the statute meets this demanding standard, and I would hold that N.C.G.S. § 14-225.2(a)(2) "restricts speech, not merely nonexpressive conduct; that this restriction is content based; and that it is not narrowly tailored to the State's asserted interest in protecting [jurors and the judicial process] from the harms of [potential juror intimidation]." Id. at 880, 787 S.E.2d at 822. "It is well established that, as a general rule, the Government 'may not suppress lawful speech as the means to suppress unlawful speech.' That is what North Carolina has done here. Its law must be held invalid." Packingham , 582 U.S. at ----, 137 S.Ct. at 1738, 198 L.Ed.2d at 283 (citation omitted). I would hold that N.C.G.S. § 14-225.2(a)(2) "violates the First Amendment's guarantee of the freedom of speech." Bishop , 368 N.C. at 880, 787 S.E.2d at 822.
II. As Applied
Assuming, arguendo , N.C.G.S. § 14-225.2(a)(2) is not unconstitutional on its face, I would hold that it was unconstitutional as applied in the present case. Because I believe the First Amendment is implicated in this case, the actions of Defendant and his associates were protected by the First Amendment absent sufficient evidence that their actual conduct demonstrated Defendant had made an agreement with either Dan or Kathryn to *539 communicate a "true threat" to one or more of the six jurors involved, and that they intended to follow through with their intent to intimidate at least one juror at the time the agreement was made. After thoroughly reviewing the trial testimony of all the witnesses, and watching the video footage of the actual interactions between the different parties, I cannot find evidence of conduct reaching the level of a "true threat," or of any conspiracy to communicate such a "true threat."
In the present case, all six of the jurors who testified said that the content of Defendant's speech-as well as that of Dan and Kathryn-was limited to the following, or variations thereof: telling the jurors that their verdict was wrong, and that Dan was innocent; telling the jurors that their verdict had ruined Dan's life; telling the jurors that, due to their verdict, Dan would not be able to find a job; and telling the jurors that they hoped the jurors could "sleep well" and "live with themselves." Every juror testified that no one in Defendant's party made any statements indicating an intent to physically injure anyone, or an intent to act violently in any manner. Every juror testified that none of the physical actions of Defendant or the other parties demonstrated an intent to *691 physically harm any juror. Some jurors did testify that they felt intimidated, and that they formed concerns that Defendant, Dan, or Kathryn could, at some later time, try and track them down at their homes and harm them. However, not a single juror could articulate anything concrete that happened at the courthouse in support of their fears that they might be in some future danger at the hands of Defendant, Dan, or Kathryn.
The video does not show any threatening actions by Defendant, Dan, or Kathryn. Every juror explained that their feelings of fear or anxiety were primarily based upon their knowledge that Dan had been in a violent fight in the past (where Dan was badly beaten), that Defendant had been present at that fight, and that Dan had acted belligerently toward the police and others following that fight as they were attempting to aid him. No juror articulated anything that Defendant or the others had done beyond expressing displeasure with the jury verdict in a manner the jurors felt was aggressive and disrespectful. I can find nothing that rose to the level of a "true threat" in the evidence presented at trial.
More importantly to this analysis, the trial court did not give any instructions defining what could constitute a "threat" or "intimidation." Specifically, the instruction given allowed the jury to convict Defendant without making any determination that the State proved beyond a reasonable doubt that anything Defendant, Dan, or Kathryn did constituted a "true threat," or that limited any conspiracy to one in which the alleged conspirators intended to communicate any "true threat." Brandenburg v. Ohio , 395 U.S. 444, 448-49, 89 S.Ct. 1827, 1830-31, 23 L.Ed.2d 430, 434 (1969) (as applied First Amendment violation found when "[n]either the indictment nor the trial judge's instructions to the jury in any way refined the statute's bald definition of the crime in terms of mere advocacy not distinguished from incitement to imminent lawless action"). In the present case, the jury acquitted Defendant on all the charges requiring proof that Defendant actually "threatened" or "intimidated" the jurors-even under the broad definitions of "threat" and "intimidate" that they were allowed to apply. Because Defendant was convicted based upon his protected speech, and the trial court's instructions did not require the jury to find a conspiracy to communicate a "true threat" in order to convict Defendant, I would also find the statute violated Defendant's First Amendment rights as applied to him in this case.
III. Overbreadth
For the reasons articulated above, I would also hold that the statute is facially overbroad under the First Amendment. "According to our First Amendment overbreadth doctrine, a statute is facially invalid if *692 it prohibits a substantial amount of protected speech." United States v. Williams , 553 U.S. 285, 292, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650, 662 (2008) (citation omitted). "[T]he threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." Id. (citations omitted). "The *540 first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." Id. at 293, 128 S.Ct. at 1838, 170 L.Ed.2d at 662. N.C.G.S. § 14-225.2(a)(2) prohibits any person from taking any action that a juror, law enforcement officer, or prosecutor deems to be "threatening" or "intimidating"-including acts of protected speech or expressive conduct-so long as that action is interpreted as having been taken in response to any official action of a juror. The prohibited action may occur at any time, and in any place, and the State need not prove that the person had any intent to "threaten" or "intimidate," only that the action could be interpreted as "threatening" or "intimidating." The amount of protected speech potentially prohibited by the statute is substantial, and I would hold that it "is facially invalid [because] it prohibits a substantial amount of protected speech." Id. at 292, 128 S.Ct. at 1838, 170 L.Ed.2d at 662. However, I believe a statute could be drafted in such a manner as to pass constitutional muster by including a "true threat" requirement: "[T]his opinion should not be interpreted as barring a State from enacting more specific laws than the one at issue. Specific criminal acts are not protected speech even if speech is the means for their commission." Packingham , 582 U.S. at ----, 137 S.Ct. at 1737, 198 L.Ed.2d at 281 ; Bishop , 368 N.C. at 878 n.3, 787 S.E.2d at 821 n.3 (citations omitted).
IV. Void for Vagueness
"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson , 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903, 909 (1983) (citations omitted). Based on my analysis of the facts and the law above, I would find this statute is void for vagueness. There are many actions that could lead to prosecution under the statute that ordinary people would not understand as prohibited, and would instead understand as an exercise of free speech in response to governmental action. I believe the statute does encourage arbitrary and discriminatory enforcement, including in the present case.
The majority opinion holds that, because this Court found the term "intimidate" was not unconstitutionally vague in *693 Hines , 122 N.C. App. at 552-53, 471 S.E.2d at 114, Defendant's argument fails. However, Defendant's argument is not limited to the definition of "intimidate," and the majority opinion's holding here is predicated on its earlier holding that, even for First Amendment purposes, "threaten" and "intimidate" are not required to be defined as "true threats." Instead, the majority opinion adopts the dictionary definition of "intimidate" as set forth in Hines : " 'Intimidate' is commonly defined as 'to make timid or fearful: inspire or affect with fear: frighten.' " Id. at 552, 471 S.E.2d at 114 (citation omitted). I do not believe, for example, the statute as written "define[s] the criminal offense with sufficient definiteness that ordinary people can understand" what conduct might make a juror feel "timid" or "fearful;" when or where protest against official action of a juror will be lawful, and when or where such protest will be unlawful; what "official actions" are covered by the statute; or whether any intent to "frighten" or "make feel timid" is actually required. Kolender , 461 U.S. at 357, 103 S.Ct. at 1858, 75 L.Ed.2d at 909.
V. Jury Instruction
I would hold that the trial court erred in denying Defendant's request for jury instructions properly defining "intimidation." There was considerable confusion at the charge conference concerning what specific words would be included in the instruction because the pattern instruction is actually an instruction for N.C.G.S. § 14-225.2(a)(1) with a footnote stating: "This instruction deals with harassing, intimidating, or communicating with a prospective or sitting juror as defined in G.S. 14-225.2(a)(1). For threatening or intimidating a former juror as defined in G.S. 14-225.2(a)(2) amend the charge accordingly." N.C.P.I. - Crim. 230.60. The State made a last minute request to change its written request from simply "intimidating" to *541 "threatening or intimidating." Defendant had come to the charge conference with two written alternative proposals to add to the pattern instruction, one of which stated: "Regarding the term intimidate, the State would be required to prove that [D]efendant means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. See State v. Bishop , [368] N.C. [869] 787 S.E.2d 814, FN3 (2016)." Defendant's attorney argued that defining "intimidate" was required "in order to find the statute constitutional[.]"[6] T438 The trial court *694 denied Defendant's request, and instructed the jury without any definition of "threaten" or "intimidation," and without any requirement that the evidence demonstrated that Defendant conspired with either Dan or Kathryn to communicate a "true threat," as follows:
[D]efendant has been charged with threatening and or intimidating a juror. Now I charge that for you to find [D]efendant guilty of this offense, the State must prove three things beyond a reasonable doubt. First, that a person had served as a juror and had just been discharged from that jury service. Second, that [D]efendant threatened and/or intimidated that person. And, third, that [D]efendant threatened and/or intimidated that former juror as a result of a prior official action of that person as a juror.
So I charge that if you find from the evidence beyond a reasonable doubt that on or about the alleged date a person had served as a juror, and had been discharged from that jury service as a juror, and that [D]efendant threatened and/or intimidated that person, and that [D]efendant intended thereby to threaten and/or intimidate that person as a result of a prior official action of that person as a juror, it would be your duty to return a verdict of guilty.[7]
The trial court's denial of the requested instruction allowed the jury to convict Defendant on a theory that, in response to Dan's verdict, he conspired with another person " 'to make timid or fearful: inspire or affect with fear: [or] frighten' " a juror, Hines , 122 N.C. App. at 552, 471 S.E.2d at 114 (citation omitted)-instead of requiring the State to prove that the conspiratorial intent of Defendant and another was to communicate a "true threat" as required by the First Amendment. I would vacate Defendant's conviction on this basis as well.
*695 VI. Conspiracy
I would first hold that Defendant's motion to dismiss the conspiracy charge should have been granted because there was no evidence presented that Defendant made an agreement with anyone to communicate a "true threat" to any juror. However, even absent consideration of the constitutional issues discussed above, I do not believe there was sufficient evidence presented at trial to support the charge of conspiracy even under the majority opinion's reasoning. "A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means." State v. Gibbs , 335 N.C. 1, 47, 436 S.E.2d 321, 347 (1993) (citations omitted).
The State was required to prove that Defendant, along with either Dan or Kathryn, made an agreement to harass at least one juror by threats or intimidation, and that the *542 conspirators "intended the agreement to be carried out at the time it was made." State v. Euceda-Valle , 182 N.C. App. 268, 276, 641 S.E.2d 858, 864 (2007) (citations and quotation marks omitted). I disagree with the majority opinion's contention that Defendant's argument "that the State presented insufficient evidence that he intended 'to threaten or menace any juror' " is irrelevant to the conspiracy charge. While it is true that there is nothing inconsistent or improper when a jury convicts on a conspiracy charge but acquits on the underlying criminal charge-each co-conspirator must actually form the intent to commit the underlying offense before they can conspire with one another to commit that offense . Id. As the trial court correctly instructed, it was the State's burden to prove that Defendant and any co-conspirator "intended at the time the agreement was made that it would be carried out [.]" (Emphasis added). Finally, "[w]hile conspiracy can be proved by inferences and circumstantial evidence, it cannot be established by a mere suspicion, nor does a mere relationship between the parties or association show a conspiracy ." Id. (citations and quotation marks omitted) (emphasis added); see also State v. Golphin , 352 N.C. 364, 458, 533 S.E.2d 168, 229-30 (2000) (citation omitted) ("If, however, the evidence 'is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed.' "). I find the evidence of conspiracy in the present case amounts to nothing more than mere suspicion or conjecture based upon the relationship between the alleged conspirators and the fact that they were together when they expressed to the jurors their disagreement with Dan's conviction. *696 First, the State conceded at trial that no conspiracy occurred while Defendant, Dan, or Kathryn were still inside the courtroom.[8] As the State argued in its closing: "I'm not saying they planned it beforehand. I'm saying they acted on it when they got out into the lobby[.]" Therefore, I review the evidence from the "lobby," or common area right outside the courtroom. For a significant amount of time, Defendant was alone in the lobby. Rose Nelson ("Nelson") was the first juror to leave the courtroom, but there could not have been any conspiracy to intimidate Nelson, because she left the courtroom before Dan or Kathryn joined Defendant in the lobby. None of Defendant's interactions between jurors Kinney Baughman ("Baughman"), William Dacchille ("Dacchille"), Denise Mullis ("Mullis"), or Lorraine Ratchford ("Ratchford"), as they exited the hallway and walked to the jury room, could have constituted evidence of a conspiracy either-for the same reason: Dan and Kathryn were still in the courtroom at that time. Therefore, during these initial confrontations, when Defendant was alone, Defendant had already formed the intent, and acted upon that intent, to tell the jurors things like "he hoped that [Nelson] could live with [herself] because [she] had convicted an innocent man, and then as [Nelson] was making [her] way to the stairs trying to get down the stairs, he was saying something about the crooked Boone police, and he hoped that [she] slept well[;]" that Dan was "an innocent man, he's an innocent man[;]" that "[Mullis] got it wrong, that [she] made a mistake[;]" and "congratulations, you [Ratchford] just ruined [Dan's] life." The jury determined that these actions did not constitute "threatening" or "intimidating" the jurors even under the broad definitions of these terms allowed by the trial court. Dacchille and Ratchford testified that they did not have any further disturbing interactions with Defendant and, therefore, they had no such interactions after Dan and Kathryn had joined Defendant. Mullis testified that while she was in the jury room she "could hear voices," but "didn't know what was being said[,]" and that nobody said anything to her as she left the jury room and entered the stairwell.
The only juror to actually engage with the family in the lobby-as opposed to silently walking past Defendant, Dan, and Kathryn while leaving the lobby-was Baughman. Baughman was in the jury room-with Dacchille, Mullis, and Ratchford-when first Kathryn, followed by Defendant's and Dan's mother ("Ms. Mylett"), then Dan, exited the *543 courtroom and joined Defendant in the lobby.[9] Kathryn was crying as she *697 left the courtroom and walked around the open courtroom door toward Defendant, who was standing still with his back to the courtroom wall. There was a period of less than one second when Kathryn's face was facing in Defendant's direction, and Defendant clearly noticed Kathryn was upset. Defendant immediately approached her to place his hand on her head, then her back, in what appeared to be a consoling gesture, as she walked in a semicircle and stood with her face inches away from the exterior wall of the courtroom.
The video shows that this approximately one-second period when Defendant saw that Kathryn was crying was the only moment Defendant could have made eye contact with her during the time period from when she joined Defendant in the lobby and Baughman's exit from the lobby-when Baughman entered the stairwell. Defendant never made eye contact with Dan or appeared to communicate with him in any manner during this period of time. There is nothing about the interaction between Defendant and Kathryn that suggests Defendant was doing anything other than trying to console her. I do not believe any other possible inference rises above the level of speculation or conjecture. Seconds after leaving the courtroom, Dan appeared to notice Baughman as he was walking out of the jury room, and Dan walked several steps toward the jury room door. He stopped when he was approximately seven to eight feet away from the jury room door, just as Baughman was emerging. Ms. Mylett was behind Dan, and Kathryn was still near the courtroom wall, but she then started walking toward Baughman. Defendant walked behind Ms. Mylett and stood a couple of feet behind his brother as Baughman walked by first Dan, then Ms. Mylett, then Kathryn. From the time Baughman entered the lobby, the attention and focus of Defendant, Dan, Kathryn-and Ms. Mylett-was almost exclusively on Baughman. The video does not show any discernible interaction between Defendant and anyone other than Baughman-there is no video evidence that Defendant interacted with Dan or Kathryn after his initial, brief contact with Kathryn.
From the video, it appears that Dan and Kathryn began talking to Baughman right as Baughman began to walk past them, and Dan stepped back and away from Baughman to make more room for Baughman to pass by him. Defendant was behind Dan, approximately five feet away from Baughman, and Baughman continued and walked past Ms. Mylett, then Kathryn. It is unclear from the video whether Defendant or *698 Ms. Mylett were engaging with Baughman at this time, but Baughman testified that Defendant spoke to him as he initially walked past the family, saying "that his brother was an innocent man, that [Baughman] had done wrong." The attention of Defendant, Dan, and Kathryn was constantly focused on Baughman throughout this encounter; they were never in positions to make eye contact with each other, and they did not touch each other. Logically, by this time-when Defendant, Dan, and Kathryn had all begun to express their frustration over the verdict with Baughman-the conspiracy to intimidate jurors-if any-would have already been committed. The actions of Defendant, Dan, and Kathryn following this initial confrontation were simply a continuation of what had already begun, and add little to the sufficiency analysis for the conspiracy charge.
Baughman first testified that the family "surrounded" him, but upon watching the video, he agreed: "Not surround me. They were grouped there in front of me as I was coming out of the room." Both Dan and Defendant had their hands in their pants pockets as Baughman walked past them, and Kathryn was holding the shoulder strap of a leather bag with both hands. Baughman further testified that Kathryn "pounced" on him and was telling him "but you convicted [Dan], you sent him to jail, you ruined his life and it's all your fault." Baughman testified that Dan "did a lot of shaking of his head." When *544 Baughman was first confronted after leaving the jury room, Dacchille, Ratchford, and Mullis were still in the jury room. None of them could hear what was being said except Ratchford, who testified that she heard Kathryn "screaming [Dan will] never get a job." Dacchille walked from the jury room directly to the stairwell while Baughman was still in the lobby, but nobody engaged him.
Baughman kept walking toward the hallway, and neither Defendant nor Dan moved at all from where they had been standing. Kathryn walked away from Baughman. From the video, Kathryn was the most animated, but her most animated actions occurred when she was on the opposite side of the room from Baughman. Baughman was nearing the hallway when he stopped, turned, and engaged with Defendant, who was saying something to him. Baughman then walked toward Defendant, and engaged in a brief conversation with him. Baughman testified as to the reason he engaged with Defendant, stating "you know, I'm a former professor, I like to explain things." Baughman was trying to explain to Defendant why the jury reached the verdict that it had reached, but Defendant and Kathryn were interrupting him to say that Dan was innocent. Baughman then decided to walk to the stairwell, instead of down the hallway, so he again walked across the lobby and past the family. It *699 appears that Defendant and Kathryn continued to argue with Baughman as Baughman walked by and into the stairwell. Defendant, Kathryn, and Dan all moved away from Baughman as he passed by, insuring that Baughman's path out of the lobby was not blocked. From the video evidence, there is nothing suggesting Defendant, Dan, or Kathryn had communicated with each other in any manner during this relevant period,[10] much less conspired to harass Baughman. Although conspiracy does not require the commission of the underlying crime, the fact that Defendant, Dan, and Kathryn clearly moved away from Baughman whenever he was trying to walk past them was certainly not evidence that could have been reasonably interpreted as supporting the conspiracy charge.
There was also no testimonial evidence suggesting any conspiracy to threaten or intimidate. When the State asked what tone of voice Defendant was using at this time, Baughman testified: "Well, it's firm, but, I mean, he's not yelling at me here. So the way I recall was, [Defendant was saying] my brother was innocent, he's an innocent man, and, you know, we had done wrong. In this case, you know, I'd done - - you done wrong." Baughman testified that Defendant was not raising his voice, but that he was talking in a tone that was "not pleasant[,]" and that Defendant "was clearly upset about the verdict." Baughman testified that during the encounter he "didn't feel physically confronted[,]" or that anyone was "about to inflict violence" on him-that he "didn't feel like anybody was going to attack me here that day[.]" Concerning his interactions with the family, the State asked Baughman: "Had you ever had a quote-unquote discussion like this before?" Baughman answered that he had not in this particular context where his "civic duty" and "the law is concerned," but that "I think probably we've all been in animated discussions before." Baughman further testified that he never heard anyone talking about wanting to intimidate the jurors in any manner. Every other juror also testified that they did not hear Defendant conspiring with Dan or Kathryn, and none of them testified that they witnessed any actions that they believed indicated any such conspiracy, or that they believed any such conspiracy existed. It was the State's burden to elicit testimony from the jurors that could support the conspiracy charge, and I do not believe that burden was met.
I do not believe that Baughman's testimony or the video evidence provides evidence from which a conspiracy can be reasonably inferred. Baughman's testimony was that he engaged in debate about the verdict *700 with Defendant, who was arguing that Dan was innocent; that Kathryn was the only one who raised her voice; and that Dan did not engage verbally as much-he mainly just shook his head. Baughman did not give any testimony *545 that Defendant engaged in any conduct associated directly with either Dan or Kathryn beyond the mere fact that they were all in the lobby together as they expressed to him their disagreement with the verdict. Baughman did testify that he did not feel that he was being threatened, that he had been in "similarly animated discussions" in other contexts, and that he did not hear anything that would suggest Defendant was conspiring with anyone to threaten or intimidate him. Further, nothing in Baughman's testimony suggested that he observed any non-verbal conduct suggesting any such conspiracy. As discussed above, I also believe the video evidence fails to provide competent evidence of a conspiracy between Defendant and Dan or Kathryn. I do not believe Baughman's testimony concerning fear he allegedly felt after he had left the courthouse adds anything to the State's conspiracy case. Because the totality of "the evidence [wa]s sufficient only to raise a suspicion or conjecture as to ... the commission of the offense" I believe "the motion to dismiss [should have been] allowed." Golphin , 352 N.C. at 458, 533 S.E.2d at 229-30 (citation omitted).[11]

Much of the analysis in earlier sections of my dissent will also be relevant to later sections.

In line with the majority opinion, I will also use "speech" or "protected speech" to refer to both "protected speech" and "expressive conduct." In addition, although Defendant was only convicted on the conspiracy charge, because his intent to violate N.C.G.S. § 14-225.2(a)(2) is an element of that charge, it is appropriate to consider the constitutionality of the statute as argued by Defendant.

The State does make one argument that the statute does not implicate the First Amendment, but solely based upon its contention that "the inside of a courthouse is a nonpublic forum, where the government has wide latitude to enforce reasonable speech restrictions." This argument fails: "[The defendant] was tried under a statute applicable throughout the entire State. Any attempt to support this conviction on the ground that the statute seeks to preserve an appropriately decorous atmosphere in the courthouse where [the defendant] was arrested must fail in the absence of any language in the statute that would have put appellant on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law, not be tolerated in certain places." Cohen , 403 U.S. at 19, 91 S.Ct. at 1785, 29 L.Ed.2d at 290 (citations omitted). N.C.G.S. § 14-225.2(a)(2) proscribes the "threatening" or "intimidating" conduct "in any manner or in any place ," not just in courthouses. Id. (emphasis added). For example, nothing in the statute would have prevented Defendant from prosecution, based upon the identical conduct alleged in this case, if it had occurred in a public square or other location where "the government's ability to restrict speech is 'very limited.' " McCullen v. Coakley , 573 U.S. 464, ----, 134 S.Ct. 2518, 2519, 189 L.Ed.2d 502, 514 (2014) ; see also Packingham v. North Carolina , 582 U.S. ----, 137 S.Ct. 1730, 198 L.Ed.2d 273 (2017).

In the federal context, a defendant must intend that his actions will be perceived as a "true threat." Elonis v. United States , 575 U.S. ----, ----, 135 S.Ct. 2001, 2026, 192 L.Ed.2d 1, 16-17. The State's position at trial was that no specific intent was required; that the issue for the jury was "not whether [D]efendant intended to threaten or intended to intimidate[,]" only whether the jurors "were indeed intimidated, or were indeed threatened[.]" The State informed the jury during its closing argument that no such intent was required.

In the present case, the State elicited lengthy testimony concerning alleged fears by the jurors that Defendant, Dan, or Kathryn might come to the jurors' houses to harm them.

I also note that Defendant's attorney asked for an instruction on specific intent, and requested that the instruction conform to the language of the indictment, which stated that Defendant "did threaten and intimidate" the jurors, not that Defendant "threatened or intimidated" the jurors. The trial court also denied those requests, but Defendant does not argue those issues on appeal.

I note in the first paragraph, where the trial court is laying out the elements of the crime, it included no scienter element. The instruction as rephrased in the second paragraph seems to include an element of intent; however, based upon the charge conference and the first paragraph of the instruction, I read "intended thereby" to mean that Defendant had to intend for his "threatening or intimidating" actions to be in response to the juror's prior service. The Ninth Circuit, reviewing Supreme Court cases, has held: "We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat." U.S. v. Cassel , 408 F.3d 622, 633 (9th Cir. 2005) (footnote omitted). For federal criminal statutes, the United States Supreme Court requires proof that a defendant intended his communication to be perceived as a true threat. Elonis , 575 U.S. at ----, 135 S.Ct. at 2026, 192 L.Ed.2d at 16-17.

In order to fully review the relevant events, it is necessary to watch the video.

I note that the reason Defendant, Dan, Kathryn, and Ms. Mylett remained in the lobby during the period that followed appears to be that they were waiting for Dan's attorney to finish up in the courtroom and join them. Once Dan's attorney exited the courtroom and joined them in the lobby, they all immediately left the courthouse together.

Other than when Defendant briefly placed his hand on Kathryn as she cried by the courtroom wall.

Although I believe the critical period is limited to the time leading up to the initial group confrontation with Baughman, I would also hold, considering all the evidence, that the evidence was insufficient to survive Defendant's motion to dismiss with respect to any of the jurors individually, or with respect to "the jurors," in part, or as a whole.